UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

2008 NOV 26 ₱ 4: 04

VERONICA R. JONES, )
and ROBERT C. HYDE )
)
On behalf of themselves and all others )
Similarly situated, )
)
    Plaintiffs, )
v. )
)
PETLAND, INC., HUNTE KENNEL )
SYSTEMS & ANIMAL CARE, INC., )
HUNTE DELIVERY SYSTEM, INC., )
LOVELAND PET PRODUCTS, INC., )
DUNN & DUNN DATA SYSTEMS, INC., )
COASTAL PET PRODUCTS, INC., )
ROLF C. HAGEN (USA) CORP., )
CENTRAL GARDEN & PET )
)
    Defendants. )

Civil No. **2:08 cv 1128**

CLASS ACTION

JUDGE HOLSCHUH

JUDGE _____ MAGISTRATE JUDGE KEMP

MAG. JUDGE _____

JURY DEMAND ENDORSED HEREON

## CLASS ACTION COMPLAINT

Plaintiffs, for their Complaint against Petland, Inc. ("Petland" or the "Company"), Hunte

Kennel Systems & Animal Care, Hunte Delivery System, Inc. (together, "Hunte"), Loveland Pet

Products, Inc. ("Loveland"), Dunn & Dunn Data Systems, Inc. ("Dunn & Dunn"), Coastal Pet

Products ("Coastal"), Rolf C. Hagen (USA) Corp. ("Hagen"), and Central Garden and Pet

("Central Garden") allege and state, as follows:

### NATURE OF THE CLAIM

1.    This action is brought on behalf of Veronica R. Jones and Robert C. Hyde,

individually and on behalf of others similarly situated, and asserts claims for (i) fraud; (ii)

fraudulent inducement; (iii) breach of contract; (iv) negligent misrepresentation; (v) unjust

enrichment; and (vi) declaratory judgment against defendant Petland. In addition, plaintiffs

1

assert claims for violations of implied and express warranties of merchantability as to defendant Hunte, and claims for unjust enrichment and civil aiding and abetting against defendants Hunte, Loveland, Dunn & Dunn, Coastal, Hagen, and Central Garden.  For the reasons set forth below, plaintiffs seek, *inter alia,* compensatory and consequential damages, attorneys' fees and injunctive relief.  Plaintiffs and the members of the Class are all franchisees of the Petland pet store chain from November 26, 1993 until the present.

## JURISDICTION AND VENUE

2.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) in that the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which plaintiffs and one or more of members of the putative class are citizens of a state different from any of the defendants.

3.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(2), in that a substantial part of the events or omissions giving rise to the claims herein occurred in this District.  Moreover, plaintiffs and Petland specifically contractually consented to suit in this District in a forum selection clause in the parties' Franchise Agreement, ¶ 28.  *See* Franchise Agreement, dated September 22, 2005 (the "Franchise Agreement"), attached hereto as Exhibit A.

## PARTIES

4.      At all times relevant to this action, Dr. Jones and Mr. Hyde had a partnership organized and existing under the laws of the State of Tennessee with its principal place of business in Murfreesboro, Tennessee, and created for the sole purpose of opening and operating a Petland franchise.  The Murfreesboro Petland retail store was located at 1948 Old Fort Parkway in Murfreesboro.  Dr. Jones and Mr. Hyde are parties to the Franchise Agreement.

5.     Petland is an Ohio corporation that maintains its principal place of business at 250 Riverside Street, Chillicothe, Ohio.  Petland is in the retail pet industry, specializing in the sale of pets and pet supplies.  In addition, Petland franchises its pet supply business to franchisees both within, and without, Ohio.

6.     Hunte's principal place of business is in Missouri.  Hunte is in the business of supplying puppies to pet stores and, for all relevant purposes here, is the preferred supplier of puppies to Petland, and supplied the puppies that are the subject matter of the allegations against Hunte in this Complaint.

7.     Loveland's principal place of business is at 7160 Industrial Row Drive, Mason, Ohio 45040.  Loveland is in the business of supplying pet supplies and, for all relevant purposes here, is one of the preferred suppliers of pet store merchandise to Petland, and supplied the store merchandise to plaintiffs that is the subject matter of the allegations against Loveland in this Complaint.

8.     Dunn & Dunn's principal place of business is at 9035 Americana Road, #16, Vero Beach, Florida 32966.  Dunn & Dunn is the developer of the POS software that, pursuant to the Franchise Agreement, must be used in all of Petland's franchises and that is the subject matter of the allegations against Dunn & Dunn in this Complaint.

9.     Coastal's principal place of business is at 911 Leadway Avenue, Alliance, Ohio. Coastal is in the business of supplying pet supplies and, for all relevant purposes here, is one of the preferred suppliers of pet store merchandise to Petland, and supplied the store merchandise to Class members that is the subject matter of the allegations against Coastal in this Complaint.

10.    Hagen's principal place of business is at 305 Forbes Boulevard, Mansfield, Massachusetts 02048.  Hagen is in the business of supplying pet store merchandise to pet stores

and, for all relevant purposes here, is one of the preferred supplier of pet supplies to Petland, and supplied the products that are the subject matter of the allegations against Hagen in this Complaint.

11.     Central Garden's principal place of business is at 1340 Treat Boulevard, Suite 600, Walnut Creek, CA 94597. Central Garden is in the business of supplying pet supplies and, for all relevant purposes here, is one of the preferred suppliers of pet store merchandise to Petland, and supplied the store merchandise to Class members that is the subject matter of the allegations against Central Garden in this Complaint.

## GENERAL ALLEGATIONS

12.     This is a class action brought by franchisees of the Petland pet store chain arising from the illegal business scheme of Petland and its web of affiliated vendors, including Hunte, Dunn & Dunn, Loveland, Coastal, Hagen, and Central Garden. In its marketing materials and uniform franchise agreement, Petland sells to potential franchisees what it calls its "System," involving "uniform standards, methods, techniques and expertise, procedures and specifications developed by [Petland] for establishing, operating, and promoting a retail animal care business specializing in the merchandising and sales of pets, pet supplies, pet services, and pet related items." (Franchise Agreement, Ex. A hereto, at p. 4 (§ 1)).

13.     Petland insists that its franchisees operate "in strict accordance with the System," through which, according to Petland, the franchisees allegedly will have the benefit of Petland's proprietary computer hardware and software, as well as only Petland's syndicate of approved vendors. (Franchise Agreement, Ex. A hereto, at pps. 2 & 4). According to Petland, so long as the franchisees follow the "System," they will be successful.

4

14.     The "System," however, works in only one direction - for the benefit of Petland and its affiliated vendors.  Plaintiffs and members of the class were fraudulently induced to purchase failing Petland franchises for hundreds of thousands of dollars per franchise when Petland knew, or should have known, that the franchises could not succeed.  Upon information and belief, as part of the unlawful scheme described herein, once a franchise has failed and Petland has charged the franchisee an exorbitant termination fee, Petland looks to "flip" the store by inducing new unwary franchisees into purchasing the franchise that is similarly doomed to fail.  This "sign up and shut down" modus operandi is a concerted scheme to defraud franchisees while reaping excessive, punitive and penalizing profits through the extortion of unlawful liquidated damages against unwitting – and soon financially broke – franchisees.

15.     Beyond that, defendants further induced its franchisees to spend hundreds of thousands more on animals and merchandise from its network of "approved vendors," when defendants knew or should have known that its approved vendors' animals were often sick, and the approved merchandise overpriced.  Upon information and belief, as part of the unlawful scheme described herein, Petland's affiliated vendors paid kickbacks to Petland in exchange for their status of approved vendors.  The named plaintiffs represent a putative class of dozens of deceived franchisees and former franchisees.

16.     Petland has been in business since 1967, and in 1972 began operating a system of franchised pet stores and offering franchises for sale to members of the general public across the United States.  Petland also has stores that it runs itself as so-called "corporate stores."

17.     Petland offers its "Franchised Businesses" for sale to the public at large. Franchise Agreement, Ex. A hereto, at p. 2.  The Franchised Businesses may only be operated at the location set forth in the Franchise Agreement.  *Id*. at p. 4 (§2(a)).

18.     The initial franchise fee for a Petland franchise is typically $25,000 for a new store and $12,500 for an existing store.  Petland publicly estimates the total initial cash investment for a Petland franchise is between $75,000-$150,000.

19.     Petland markets and sells its franchisees to the consuming public at large through various forms of advertising, including its website and print media.

20.     In addition to paying the initial franchise fee, franchisees, including Plaintiffs and the members of the Class, are obligated by Petland to sign a form franchise agreement with Petland.  Each agreement signed by Plaintiffs and others similarly situated is substantially identical in their terms and conditions material to this action.  Plaintiffs had no opportunity to negotiate the terms of these agreements.  Petland offers the franchise agreement on a "take-it-or-leave-it" basis.  The agreement is adhesive and deliberately one-sided.

21.     The Franchise Agreement states that franchisees may only open a store "at and only at the location set forth" in the Agreement.  (Franchise Agreement, Ex. A hereto at p. 4, §2(a)).  Petland thus maintains unilateral control over the approval of the franchisee's location and the franchisee's lease.  The approval terms included in the Franchise Agreement are extremely one-sided, in favor of Petland.

22.     The Franchise Agreement further represents that Petland has developed a "System" for "establishing, operating, and promoting a retail animal care business specializing in the merchandising and sales of pets, pet supplies, pet services, and pet related items..," and provides that any franchisee must operate its business "in strict accordance" with the uniform "System" and adhere to Petland's "high and uniform standards of quality, operations and services…"  (*Id*. at p. 2).

23.     The "System" is defined in the Agreement as the "uniform standards, methods, techniques and expertise, procedures and specifications developed by [Petland] for establishing, operating, and promoting a retail animal care business specializing in the merchandising and sales of pets, pet supplies, pet services, and pet related items." (*Id.*) According to Petland, "[t]he distinguishing characteristics of [Petland's] System include, without limitation, distinctive store design, layout, décor and color scheme, specially designed signage, operating methods, procedures and techniques, methods and techniques for inventory and cost controls, recordkeeping and reporting, personnel management and training, marketing, merchandising and advertising, sales and promotional techniques, and the Petland Manual, all of which may be changed, improved, further developed or otherwise modified by [Petland] in its sole discretion from time to time." (*Id.* at p. 4, §1).

24.     In addition, franchisees are all required under the uniform Franchise Agreement to "purchase and use in [their] operation of the Franchised Business the computer hardware and software specified by [Petland] in the Manual, including, but not limited to, the point of sale software system that was designed for [Petland]." (*Id.* at p. 10, §7(d)(i)). The proprietary Petland point of sale software system, developed and maintained by defendant Dunn & Dunn, is referred to herein as the "POS system."

25.     The POS system which franchisees must purchase and use at their stores is uniformly deficient and full of bugs. Petland is well aware of the problems with its POS software, and indeed, in November 2006, received a very detailed report concerning those issues from one of its systems consultants. Petland does not disclose these problems to its franchisees and does nothing to assist them when the software breaks down. Nor does its approved vendors, Dunn & Dunn. For many Class members, the POS software never worked properly the entire

time they ran their Petland franchises. Because of the bugs in the system, the POS software crashes several times a day, causing franchisees to lose valuable credit transactions and causing customers to walk out of the store in frustration .

26.     In addition, plaintiffs and the Class members are all required to "equip, supply and inventory" their businesses with "items supplied by Franchisor and Franchisor-approved vendors." (Franchise Agreement, Ex. A hereto., at p. 15, § 10(a)). Franchisees may "carry only those products and pets and offer those services which Franchisor has approved or which are purchased from suppliers approved by Franchisor." (*Id*. at p. 15, §10(c)). Defendants Hunte, Loveland, Central Garden, Hagen, Dunn & Dunn and Coastal, are all such "approved vendors" with whom plaintiffs and other Class members were induced to do business. Upon information and belief, Petland receives consideration in the form of kick-backs (called "Marketing Dollars") from its "approved vendors" such as Hunte, Loveland, Central Garden, Hagen, Dunn & Dunn and Coastal in exchange for inducing franchisees to use only those vendors. Although Petland represents to franchisees that they will save money using its approved vendors, in fact, plaintiffs and Class members learn later that the margins on the products and merchandise sold by Hunte, Loveland, Central Garden, Hagen, Dunn & Dunn and Coastal are such that franchisees cannot possibly make money selling those vendors' merchandise. What is worse, the animals provided by Hunte are often diseased upon arrival, costing franchisees tens of thousands of dollars in veterinarian bills.

27.     Finally, in the Franchise Agreement, Petland promises each franchisee that it will provide "field service assistance by a Franchisor representative" as well as its "Marketing and Merchandising Planner" for the franchisee's "use in preparing and implementing marketing and promotional programs." (Franchise Agreement, Ex. A hereto, at p. 19, § 12(a)(xii)). Uniformly,

however, these business consultants are assigned dozens of stores and have little, if any, time to spend with any one franchisee. In the case of plaintiffs Jones and Hyde, plaintiffs' assigned consultant spent no more than approximately 60 hours in their store during the two and a half years it was open.

28.     Lawsuits asserting similar allegations have been filed in this District on an individual basis by franchisees from other locations around the country, including *Arnold v. Petland, Inc., et al*., Civ. Action No. 2:07-cv-1307 and *Blasko v. Petland, Inc., et al*., Civ. Action No. 2:08-cv-1105.

## CLASS ACTION ALLEGATIONS

29.     Pursuant to Federal Rules of Civil Procedure 23(a) and (b), plaintiffs bring this action on behalf of themselves and the Class of similarly situated persons defined as:

> All persons (including business entities) who purchased a Petland franchise at any time between November 26, 1993 and the present.

### Rule 23(a)

30.     **Numerosity**: Members of the Class are so numerous that their individual joinder is impractical.  In addition, the Class is geographically dispersed.  The precise identities, number and addresses of members of the Class are unknown to Plaintiffs, but may and should be known with proper and full discovery of defendants, third parties, and all relevant records and documents.

31.     Upon information and belief, the Class includes potentially hundreds of members (including present and past franchisees).  All members of the Class assert violations as set forth in this Complaint.

32.    **Commonality**: There is a well-defined commonality and community of interest in the questions of fact and law affecting the members of the Class.  Among other things, the common questions of fact and law include:

a.   Whether and to what extent defendants' practices, conduct and misrepresentations are unlawful;

b.   Whether, in connection with the filing, offer, or sale of the subject franchises, defendants directly or indirectly made any untrue statements of material fact or omitted certain material facts necessary in order to make the statement(s) made, in the light of the circumstances under which they were made, not misleading;

c.   Whether, in connection with the filing, offer, or sale of the subject franchises, defendants directly or indirectly engaged in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person;

d.   Whether defendants Hunte, Loveland, Coastal, Dunn & Dunn, Hagen, and Central Garden aided and abetted Petland in any act, practice of course of business which operates or would operate as a fraud or deceit upon any person;

e.   Whether defendants' affirmative statements and material omissions constitute intentional fraud;

f.   Whether Petland breached terms of its Franchise Agreement;

g.   Whether plaintiffs and members of the Class sustained injury as a result of Petland's breaches of the Franchise Agreement;

     h.   Whether defendant Hunte breached its implied and express warranties of merchantability to plaintiffs and the Class members;

     i.   Whether plaintiffs and Class members are entitled to recover compensatory, consequential, exemplary, treble, statutory or punitive damages based on defendants' fraudulent and illegal conduct or practices and/or otherwise;

     j.   Whether temporary and permanent injunctive relief is appropriate for all Class members; and

     k.   Whether plaintiffs and Class members are entitled to an award of reasonable attorneys' fees, prejudgment interest, and costs of suit.

33.    **Typicality**: Plaintiffs are members of the Class.  Plaintiffs' claims have a common origin and share common bases.  They originate from the same illegal and fraudulent practices of the defendants, and the defendants act in the same way toward the plaintiffs and all other Class members.  If brought and prosecuted individually, the claims of each Class member would necessarily require proof of the same material and substantive facts, rely on the same remedial theories, and seek the same relief.

34.    **Adequacy:** Plaintiffs are adequate representatives of the Class because their interests do no conflict with the interests of the members of the Class they seek to represent. Plaintiffs have retained competent counsel, and intend to prosecute this action vigorously. Plaintiffs' counsel will fairly and adequately protect the interests of the Class.

**Rule 23(b)(2) and (3)**

35.    This lawsuit may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) because plaintiffs and the Class seek declaratory and injunctive relief, and all of the above factors of numerosity, common questions of fact and law, typicality and adequacy

are present.  Moreover, defendants have acted on grounds generally applicable to plaintiffs and the Class as a whole, thereby making declaratory and/or injunctive relief proper and suitable remedies.

36.     This lawsuit may be maintained as a class action under Federal Rule of Civil Procedure 23(b)(3) because questions of fat and law common to the Class predominate over the questions affecting only individual members of the Class, and a class action is superior to other available means for the fair and efficient adjudication of this dispute.  The damages suffered by each individual class member may be disproportionate to the burden and expense of individual prosecution of complex and extensive litigation to proscribe defendants' conduct and practices. Additionally, effective redress for each and every Class member against defendants may be limited or even impossible where serial, duplicate or concurrent litigation occurs arising from these disputes.  Even if individual class members could afford or justify the prosecution of their separate claims, such an approach would compound judicial inefficiencies, and could lead to incongruous and conflicting judgments against defendants.

**FACTS AS TO THE REPRESENTATIVE PLAINTIFFS**

37.     In or around early 2005, plaintiffs Veronica R. Jones and Robert C. Hyde began to look into the possibility of owning and running a pet store.  This potential business seemed a good fit for the married couple, because Dr. Jones had previously been a practicing veterinarian and then had spent the next part of her professional life in the biotechnology field, and Mr. Hyde had a degree in Animal Science.

38.     After doing some research on the internet, it appeared to plaintiffs that purchasing a Petland franchise would be a good investment.  They contacted Petland and told the Company that they were interested in opening a new store in Franklin, Tennessee, an upscale city where

12

they believed they could be successful.  Petland offered them instead a store in Murfreesboro, Tennessee, which had previously failed.  According to Petland representatives and officers, the prior franchise owner had been inept.  With some remodeling and in the hands of capable owners, the store could "easily" make $150,000 a month.  If plaintiffs did not purchase the franchise, Petland represented, that with "minimal" remodeling, it was going to turn the store into a corporate store and run the store itself.

39.    The Hyde-Jones reviewed the uniform marketing materials provided by Petland, spoke further to Petland representatives, and on or about September 27, 2005, entered into a Franchise Agreement with Petland.  Although plaintiffs did not know it at the time, Petland had misled them into entering into that Agreement by providing them false, and/or materially misleading information regarding the Murfreesboro store including but not limited to:

  a.  False and/or inaccurate and misleading information regarding the true start-up costs to open the Murfreesboro Petland store consistent with Petland requirements and protocols;

  b.  False and/or inaccurate and misleading information regarding the finances, profits and losses of the immediately preceding franchisee of the same store;

  c.  False and/or inaccurate and misleading information regarding the reasons why the prior franchisee had failed to succeed in the same store location;

  d.  False and/or inaccurate and misleading information regarding the viability of the animal kennels already in place in the store; and

  e.  False and/or inaccurate and misleading information regarding the functionality of the POS data system servicing the Murfreesboro store.

These false, inaccurate, misleading and material misrepresentations regarding the business worth, potential, and functionality of the Murfreesboro store ultimately frustrated the very purpose of that franchise for plaintiffs and despite their best efforts to make the Murfreesboro Petland store a success, proximately, inevitably and irreversibly led to its failure, and ultimate closing on July 20, 2008.

40.     Unaware of the falsity, inaccuracy, misleading nature and materiality of these misrepresentations, the Hyde-Jones, nonetheless were induced by Petland to purchase the franchise on or about September 27, 2005.  Therein, the Franchise Agreement required the Hyde-Jones to pay an initial franchise fee of $25,000.  The accompanying Asset Purchase Agreement required them to pay an additional $280,000 for the store's fixtures, equipment, existing inventory, and related assets.

41.     At the direction of Petland's "business consultants," plaintiffs paid approximately an additional $450,000 in out-of-pocket expenses for remodeling, other inventory and other expenses to open the Murfreesboro store.

42.     Plaintiffs opened their store on February 26, 2006.

43.     At the outset, plaintiffs realized that a number of the animals supplied by Petland's approved vendor, defendant Hunte, were sick.  This caused plaintiffs to incur substantial veterinarian bills of approximately $40,000 (even though Veronica Jones is a veterinarian herself) and, more importantly, required the sick animals to be placed in isolation and not sold for up to ten days or more at a time.

44.     In addition, both the animals supplied by Hunte and the store merchandise that the Hyde-Jones were induced to purchase from defendant Loveland were so overpriced that plaintiffs could not possibly make enough profit to continue to run their business.  As set forth

above, upon information and belief, part of the exorbitant price that plaintiffs and the Class members had to pay to Petland's approved vendors for products and merchandise was ultimately kicked back to Petland in some form.

45.     Finally, and on top of the other failures and fraud by defendants that ultimately led to the plaintiffs' forced closure of their franchise, the Company's POS system never worked properly and on numerous occasions, caused customers to walk out of the store and precluded plaintiffs from taking credit transactions.

46.     As a proximate result of all of the above, and despite the best efforts of Mr. Hyde and Ms. Jones, by January 2007, their Petland franchise was in deep financial trouble.  When plaintiffs asked Petland for assistance, however, none was forthcoming.  Ms. Jones asked Brian Winslow, the Director of Operations of the Company, how she and her husband could possibly make the kennel run on budget while still properly caring for the animals.  He responded, "Tell me when you figure it out."

47.      On July 20, 2008, plaintiffs were forced to shut the doors of the Murfreesboro store and now face an additional $210,000 in termination fees.

## CLAIMS FOR RELIEF

### COUNT I – FRAUD
### (As To Petland)

48.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if set forth in full.

49.     Starting with the preliminary discussions regarding the purchase of their Petland franchise, plaintiffs and members of the Class were subjected to numerous material misrepresentations concerning, among other things, (i) the true start-up costs to open their Petland stores consistent with Petland requirements and protocols; (ii) the finances, profits and

losses of the immediately preceding franchisee of the same store; (iii) the reasons why the prior franchisee had failed to succeed in the same store location; and (iv) the functionality of the POS data system servicing their stores.

50.     At the time these representations were made, Petland knew they were false, or made them recklessly without knowledge of the truth.

51.     These representations and misrepresentations were made by Petland with the intention that they should be acted on by plaintiffs and the Class members.

52.     The plaintiffs and Class members, in fact and law, reasonably relied on the information provided by Petland, and acted upon them.

53.     Plaintiffs and the Class suffered damages as a result of that reasonable reliance.

54.     By virtue of Petland's fraud, plaintiffs and the Class are entitled to rescission of the Franchise Agreement and Asset Purchase Agreement, to restitution of the money paid by them to Petland for each of the Agreements, and for other economic and punitive damages.

## COUNT II– FRAUDULENT INDUCEMENT
### (As To Defendant Petland)

55.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if set forth in full.

56.     Pursuant to a fraudulent scheme, Petland exploited the trust and confidence of plaintiffs and others similarly situated in the advertised integrity, fidelity, superior knowledge and business "System" of Petland by making a series of false representations to them, or omitting or failing to disclose certain material information to them, all in order to wrongfully induce them to invest their money and sign a Petland franchise agreement.

57.     The fraudulent conduct and scheme engaged in by Petland consisted of fraud by commission and omission, which commenced prior to plaintiffs investing their money and continued throughout the term of the agreement.

58.     Plaintiffs and others similarly situated were fraudulently induced into signing their respective franchise agreements.

59.     Based upon these promises, representations and lack of knowledge of the omissions, plaintiffs and other similarly situated were fraudulently induced to give their consent to both invest their money and sign a Petland franchise agreement.

60.     In reliance upon Petland's misrepresentations, without any knowledge of the omissions fraudulently concealed, plaintiffs and others similarly situated took various actions, including but not limited to purchasing virtually worthless Petland franchises that could not be made profitable, and expending time and money in efforts to model and run a successful store, all of which caused them financial and emotional hardship.

## COUNT III– BREACH OF EXPRESS CONTRACT
### (As To Defendant Petland)

61.      Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if set forth in full.

62.     Plaintiffs signed a franchise agreement with Petland.

63.     Petland breached the franchise agreement with the plaintiffs and others similarly situated by, among other things, (i) failing to deliver assets that were in "working order" when sold to plaintiffs; (ii) failing to provide the training promised in the franchise agreement; and (iii) failing to provide adequate field service and marketing assistance as promised in the franchise agreement.

64.     By virtue of Petland's breaches of contract, plaintiffs and members of the Class are entitled to rescission of the Franchise Agreement and Asset Purchase Agreement, and are also entitled to restitution of the money paid by plaintiffs and members of the Class pursuant to those agreements, together with all other economic damages, and punitive damages.

## COUNT IV– BREACH OF IMPLIED CONTRACT
### (As To Defendant Petland)

65.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if set forth in full.

66.     Petland's actions outlined above constitute breaches of implied contract between plaintiffs and Petland.

67.     Specifically, Petland breached its agreements with plaintiffs and members of the Class to perform and administer its contracts and agreements with plaintiffs in good faith, and which obligation of good faith and fair dealing is implied in every contract.

68.     By virtue of Petland's breach of implied contract, plaintiffs and members of the Class are entitled to rescission of the Franchise Agreement and Asset Purchase Agreement, and are also entitled to restitution of the money paid by plaintiffs and the Class members to Petland pursuant to those agreements, together with all other economic damages, and punitive damages.

## COUNT V– NEGLIGENT MISREPRESENTATION
### (As To Defendant Petland)

69.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if set forth in full.

70.     Petland and its servants, agents, and/or employees, in the course if its business, supplied false and/or misleading information to plaintiffs and members of the Class in the guidance of opening and running their Petland franchises.

18

71.     Plaintiffs and Class members justifiably relied upon the information provided by Petland and its agents, servants, and/or employees.

72.     Petland and its servants, agents and/or employees failed to exercise due care and/or competence in obtaining and/or communicating necessary information to plaintiffs and the Class members regarding the opening and running of their Petland franchises.

73.     Petland and its servants, agents, and/or employees intended to influence the actions of plaintiffs and members of the Class, and had reason to know that plaintiffs and the Class members would rely on such false and/or misleading information.

74.     By virtue of Petland's negligent misrepresentations, plaintiffs and the Class are entitled to rescission of the Franchise Agreement and Asset Purchase Agreement, and are also entitled to restitution of the money paid by plaintiffs and members of the Class pursuant to those agreements, together with all other economic damages, and punitive damages.

### COUNT VI– VIOLATIONS OF IMPLIED AND EXPRESS WARRANTIES OF MERCHANTABILITY (As To Defendant Hunte)

75.      Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if set forth in full.

76.     At all times relevant, defendant Hunte was a merchant with respect to the puppies sold to plaintiffs and members of the Class as alleged in this Complaint.

77.     A substantial percentage of the puppies provided by Hunte to plaintiffs and the Class were diseased and ill.

78.     Hunte expressly warranted to plaintiffs and the Class that the puppies were healthy, and would be suitable for sale to the public.

79.    Hunte impliedly warranted to plaintiffs and the Class that the puppies were of merchantable quality, and fit for the ordinary purposes for which puppies are sold to the public.

80.    In connection with the sale of puppies to plaintiffs and the Class, Hunte knew the particular purpose for which the puppies were intended, knew that plaintiffs and the Class were relying on Hunte's skill and judgment to furnish suitable and healthy puppies, and thereby impliedly warranted that the puppies Hunte supplied to plaintiffs and the Class would be fit for their sale to the public.

81.    A substantial percentage of the puppies delivered by Hunte to plaintiffs and the Class were sick when they arrived at their respective stores, or shortly thereafter, and all required antibiotics, cough syrup, breathing treatments, ear cleanings, and/or isolation.

## COUNT VII– UNJUST ENRICHMENT
### (As to All Defendants)

82.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if set forth in full.

83.    Defendants have, by virtue of the franchise, asset purchase, and approved vendor agreements entered into by plaintiffs and others like them throughout the United States, received tens of millions of dollars in payments from franchises that never had an opportunity to be successful or receive any benefit from their investment.

84.    Defendants have, therefore, received a benefit from plaintiffs and members of the Class, the receipt of which constitutes unjust enrichment to defendants.

85.    Plaintiffs and the Class are entitled to an award of damages or restitution consisting of the amounts that they paid defendants.

20

## COUNT VIII– CIVIL AIDING AND ABETTING
### (As to Defendants Hunte, Dunn & Dunn, Central Garden, Coastal, Hagen, and Loveland)

86.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if set forth in full.

87.    Upon information and belief, defendants Hunte, Dunn & Dunn, Central Garden, Hagen, Coastal and Loveland have aided and abetted Petland's fraud by entering into arrangements with Petland to serve as Petland's "approved vendors" in exchange for paying kickbacks to Petland in the form of, among other things, "marketing dollars."

88.    Defendants Hunte, Dunn & Dunn, Central Garden, Hagen, Coastal and Loveland, in turn, knowingly sell overpriced merchandise to Petland's captive franchisees as to which plaintiff franchisees cannot make a sufficient profit margin to survive.

89.    Upon information and belief, defendants  Hunte, Dunn & Dunn, Central Garden, Hagen, Coastal and Loveland are aware of Petland's breach of duty towards its franchisees by virtue of defendants' kickback scheme, and fully participate in such scheme by paying kickbacks to Petland, and overcharging Petland franchisees for the merchandise that the franchisees are compelled by Petland to purchase only from approved vendors.

## COUNT IX– DECLARATORY JUDGMENT
### (As to Defendant Petland)

90.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if set forth in full.

91.    An actual and justiciable controversy exists between Petland, on the one hand, and plaintiffs and the members of the Class, on the other hand, concerning the parties' respective

rights and obligations under the franchise agreements, and whether Petland should be held liable for alleged misconduct during the relationship between the parties.

92.     In addition to the extremely one-sided operational and approval terms included in the adhesive form franchise agreements, Petland has included procedural obstacles, which intent to discourage claims against it and/or attempt to shield it from liability.

93.     These following provisions, among others, are unenforceable: (a) preclusion of punitive or exemplary damages; and (b) waiver of a jury trial.

94.     The inclusion of these onerous provisions in the adhesive form franchise agreement is violative of Ohio public policy and renders the franchise agreements void and unenforceable.

95.     Plaintiffs and the Class are therefore entitled to a declaration from the Court that the Petland franchise agreements signed by plaintiffs, and others similarly situated, are void and unenforceable, or in the alternative the Court shall strike those provisions that are unenforceable.

## PRAYER FOR RELIEF

**WHEREFORE** Plaintiffs respectfully request this Court to:

a.     Certify the proposed Class herein and appoint plaintiffs and the undersigned counsel of record to represent the Class;

b.     Rescind the Franchise Agreements and Asset Purchase Agreements entered into between the plaintiffs and Class members and Petland;

c.     Return to plaintiffs any and all franchise fees, royalties, rent, purchase moneys, and/or other fees imposed by Petland, and/or other costs the plaintiffs and Class members expended in furtherance of opening and operating their Petland franchises;

        d.      Enter judgment in favor of plaintiffs and the Class and against defendants for compensatory damages in an amount in excess of $20,000,000, to be proven at trial, together with costs, prejudgment interest, and post-judgment interest;

        e.      Enter judgment against defendants for punitive damages, and attorneys fees; and

        e.      Award any additional relief deemed just and appropriate.

## JURY TRIAL DEMAND

The Plaintiffs hereby demand a jury trial.

Dated: New York, New York
       November 26, 2008

Respectfully submitted,

**Attorney of Record for Plaintiffs and the Class:**

Gregory H. Melick (0069694)
Luper Neidenthal & Logan
A Legal Professional Association
50 West Broad Street, Suite 1200
Columbus, OH 43215-3374
Telephone: (614) 229-4414 (Direct)
Telephone: (614) 221-7663
Fax: (866) 345-4948
E-mail: gmelick@lnlattorneys.com

**Lead Attorney for Plaintiffs and the Class:**

_____

DARNLEY D. STEWART (NY#DS-0835)
(dstewart@gslawny.com)

GISKAN SOLOTAROFF
ANDERSON & STEWART LLP
11 Broadway, Suite 2150
New York, New York 10004
Telephone: (212) 500-5106
Facsimile: (212) 414-0347

**Attorney for Plaintiffs and the Class:**

_____

RICHARD H. KOBY (NY # RK -)
(rkoby@hartmancraven.com)

HARTMAN & CRAVEN LLP
488 Madison Avenue
New York, New York 10022
Telephone: (212) 753-7500
Facsimile: (212) 688-2870

24